## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

TERESA LOVEJOY,

                        Plaintiff,

v.                                              CIVIL ACTION NO.  2:10-cv-01386

AMERICAN ELECTRIC POWER
LONG-TERM DISABILITY PLAN, et al.,

                        Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the court are the Defendants' Motion for Summary Judgment [Docket 14] and the Plaintiff's Motion for Summary Judgment [Docket 16].  For reasons discussed below, the defendants' motion is **GRANTED** and the plaintiff's motion is **DENIED**.

### I.      Background

The plaintiff, Teresa Lovejoy, filed suit against the defendants, American Electric Power Long-Term Disability Plan, Aetna Life Insurance Company, and "Does 1 through 10," alleging violation of ERISA § 502(a)(1)(B).  As an employee of American Electric Power Services Corporation ("AEP"), Ms. Lovejoy participated in the American Electric Power Long-Term Disability Plan ("the Plan").  Ms. Lovejoy alleges that the defendants wrongfully denied her Long-Term Disability Benefits under the Plan.

#### a.  The Plan

The Plan is sponsored, funded, and administered by AEP and its subsidiaries and affiliates, and it provides Long-Term Disability ("LTD") benefits to AEP employees.  Aetna, as

1

claims administrator, determined whether participants were entitled to LTD benefits, and it maintained an appeals process for participants who contested Aetna's denial of LTD benefits.  If an employee qualified for LTD benefits, he or she would receive a monthly payment equal to 60 percent of the employee's base pay.  For the first twenty-four months from the date of disability, the Plan defined "disability" as: "an illness or injury that requires the regular treatment of a duly qualified physician that may reasonably be expected to prevent you from performing the material duties of your occupation."  (Administrative Record ("A.R.") [Docket 13], at 1036-37.)  After twenty-four months, a disability is defined as: "an illness or injury that requires the regular treatment of a duly qualified physician that may reasonably be expected to prevent you from performing the duties of any occupation for which you are reasonably qualified by your education, training and experience."  (*Id.*)  As long as the disability continues, these benefits are paid until the participant turns sixty-five.  LTD benefits are reduced if the participant receives income from other sources, such as disability benefits under the Social Security Act.

   *b.  Appeals Process*

   Ms. Lovejoy was employed by AEP as a Senior Customer Solutions Associate at its call center in Hurricane, West Virginia.  She had carpal tunnel release surgery on her right hand on April 28, 2008, and on her left hand on July 14, 2008.  The plaintiff applied for LTD benefits on October 1, 2008.  Ms. Lovejoy's entitlement to LTD benefits would begin on October 25, 2008, after the Plan's 1,040 hour elimination period completed.[1]  Ms. Lovejoy returned to work on October 27, 2008.  She called in sick on October 29, 2008, and did not return to work.  On December 10, 2008, Aetna informed Ms. Lovejoy that it approved her application for LTD

---

[1] The Plan provides that before receiving LTD benefits, a participant must be disabled for 1,040 hours of regularly scheduled work.  During this time, the participant receives no benefits, but must be under a doctor's regular care and be unable to perform the material duties of his or her occupation.  (A.R. at 1036.)  Ms. Lovejoy's 1,040 hour period began running on the date of her April 28, 2008 surgery.

benefits for October 25 and 26, 2008, but rejected her claim for LTD benefits beginning on October 29, 2008.   As part of Aetna's initial determination, Dr. Henry Spira reviewed the plaintiff's medical records, a functional capacity evaluation, the plaintiff's LTD benefits application, and a job analysis.   Ms. Lovejoy appealed Aetna's denial on December 11, 2008. She submitted to Aetna supplemental medical information, which Aetna provided to two peer reviewers—Dr. Samuel Winn and Dr. Seth Wachsman.   In May 2009, Aetna upheld its decision to deny the plaintiff LTD benefits.   The plaintiff again appealed on July 21, 2009.   It does not appear that Aetna had any additional physicians review Ms. Lovejoy's claim at this stage.   Aetna notified Ms. Lovejoy on July 28, 2009, that it upheld its denial of LTD benefits.   On August 10, 2009, Ms. Lovejoy submitted her final appeal.   At this stage, her medical information was assessed by three peer reviewers—Dr. Dennis Mazal, Dr. Jon Schmeyer, and Dr. Gary Rischitelli.   Aetna upheld its denial on September 18, 2009, and notified her that she had a right to bring a civil action under § 502(a) of ERISA.

     *c.   Facts*

     Ms. Lovejoy had surgery on her right and left hands for carpal tunnel syndrome in 2004. The plaintiff's primary care physician, Dr. Sta Ana, treated Ms. Lovejoy for anxiety, depression, hypertension, and hyperlipidemia in 2006.   In 2007, Dr. Imran T. Khawaja diagnosed Ms. Lovejoy with sleep apnea after a CPAP titration study was performed at Cabell Huntington Hospital.

     The plaintiff was again diagnosed with carpal tunnel syndrome, and on April 28, 2008, Dr. Fred Pulido performed a decompression on the plaintiff's right median nerve.   On May 4, 2008, Ms. Lovejoy checked into the Charleston Area Medical Center Teays Valley Hospital because she fell while on a camping trip the night before.   Ms. Lovejoy notified the attending

physician that she recently had surgery.  At the time of the fall, Ms. Lovejoy was wearing a wrist splint.  Ms. Lovejoy denied having discomfort in the area where she had surgery, but explained that she wanted to "make sure that it [was] okay."  (A.R. at 70.)  The physician noted that she had a mild contusion on her head and mild abrasions on her forearm.

On May 15, 2008, the plaintiff began treatment at Generations Physical Therapy ("GPT").  The report from her first visit states: "Patient states having difficulty with grip strength.  She states that numbness and tingling persists at all fingers following surgery.  She denies sharp pains at this time."  (A.R. at 75.)  Ms. Lovejoy returned to GPT on June 6, 2008, and the report from that visit states: "Patient reports no significant improvement in symptoms since the surgery."  (A.R. at 78.)  In addition, it notes that: "She [complains of] constant tingling in the 2nd, 3rd, and 4th digits.  She states that she feels like she doesn't have any strength in the hand and wrist.  She [complains of] difficulty using the television remote control and difficulty squeezing tongs when getting food from a buffet."  (*Id.*)  At that time, GPT planned to continue physical therapy three times per week for four weeks.

On June 10, 2008, Dr. Pulido advised AEP that the period of disability would extend through June 30, 2008.  He noted: "Patient having some difficulties with hand and has been assigned to 2 more weeks of therapy and will re-evaluate on 6-30-08 for a return to work date."  (A.R. at 111.)  The report from a physical therapy session, dated June 27, 2008, states that:

> Patient reports no change with pain at the hand and no change with upper extremity parasethsia.  Patient demonstrates improved wrist range of motion.  Patient demonstrates improved strength at the wrist, but she continues to have significant weakness at the hand with grip and pinch resulting in impaired ability to perform activities of daily living.

(A.R. at 123.)

On July 14, 2008, Dr. Pulido performed a decompression on Ms. Lovejoy's left median nerve.  After the surgery, Dr. Pulido extended her date of disability to October 25, 2008.  According to a report from GPT on August 4, 2008, Ms. Lovejoy complained of intermittent numbness on the entire left hand.  In addition, she continued to complain of pain in her right hand, with sharp pain in the palm and into all her fingers.  (A.R. at 140.)  She also complained of numbness in her fingers and experiencing weakness gripping things with her right hand.  (*Id.*)  The GPT report from August 25, 2008, states that Ms. Lovejoy experienced no changes in her right wrist and hand symptoms and continued to have a lot of pain and numbness.  The report also highlights that she had decreased pain and improved range of motion on her left wrist.  The September 14, 2008 report notes that Ms. Lovejoy reported a 75 percent improvement in her left hand symptoms.  Moreover, it says that she had improved wrist range of motion and strength, but maintained significant weakness in her grip.  Her goal of having hand strength that would be functional for daily activities had not been met.

Ms. Lovejoy applied for LTD benefits on October 1, 2008.  In her application, she claimed that she was unable to work because of "constant pain in right hand & wrist – fingers numb on right hand – occasional pain in left hand and wrist."  (A.R. at 192.)  She asserted that her condition was related to her job because her job entailed "constant typing with each call at work."  (*Id.*)  On October 2, 2008, GPT performed a functional capacity evaluation.  (A.R. at 238.)  At that time, Ms. Lovejoy complained of constant numbness and pain in her right hand.  The pain in her left hand was not constant, but she said that it flared up at times.  She rated the pain on her right hand as an eight out of ten and on her left hand as a four or five.  The evaluation states, "Overall I believe she is physically capable of performing the tasks involved in the Functional Capacity Evaluation."  (A.R. at 240.)  It concludes that Ms. Lovejoy tested at a

"sedentary" physical demand characteristics level. (A.R. at 242.) The evaluation also notes that she had some limitations, including difficulty with fine motor tasks. In addition, it states that she "is limited mostly by decreased sensation in her right digits 2-4, as well as pain and fatigue in bilateral wrists." (*Id.*) Moreover the evaluation reports that,

> Deficits in the physical exam included: decreased wrist active range of motion, decreased strength with right wrist flexion and extension, pain with active flexion and extension bilaterally, decreased right hand and wrist light touch sensation, impaired sharp/dull discrimination with dermatomes C5-C8 on right upper extremity, decreased scar mobility (left more limited than right), and decreased grip strength bilaterally.

(*Id.*) The recommendation states that: "At this time Ms. Lovejoy did demonstrate the ability to perform at her subjective occupational level of 'sedentary.'" (*Id.*) However it notes that accommodations would have to be made, including an ergonomic work station and several fifteen minute breaks throughout the day to ice her wrists. (*Id.*)

Ms. Lovejoy saw Dr. Pulido on October 30, 2008. Dr. Pulido reported that, "on the morning of her second day at work her hands were stiff with severe shooting pains up both arms. On the morning of her third day to work, her hands were so stiff she could not open and close them. She did not return to work after the second day." (A.R. at 308.)

Dr. Spira reviewed Ms. Lovejoy's claim to make a recommendation to Aetna for its initial determination of LTD benefits. (A.R. at 324.) He is certified by the American Board of Psychiatry and Neurology. The records for review included Dr. Pulido's medical records, the October 2, 2008 functional capacity evaluation, her LTD benefits application, and a job analysis. He also personally consulted with Dr. Pulido. Dr. Pulido informed Dr. Spira that: "[T]here are no abnormal clinical findings. The claimant complains of pain in her hands, arms and shoulders. She has never had swelling of her hands or fingers but this is a current complaint." (A.R. at 325.) In addition, "The restrictions of icing her hands periodically during work are strictly based

6

on her complaints." (*Id.*)  Dr. Spira concluded that "[b]ased on the provided documentation and telephonic consultation the data does not support a functional impairment from an objective neurological standpoint from 10/29/08 through 12/31/08." (A.R. at 326.)  He further stated that, "There are no clinical findings to warrant any restrictions or limitations." (*Id.*)

On December 10, 2008, Aetna wrote a letter to Ms. Lovejoy, explaining that Aetna reviewed her eligibility for LTD benefits and based on that information she met "the definition of disability as defined in the Plan." (A.R. at 368.)  It then states that she became eligible on October 25, 2008, and that her first check covered the period of October 25 and 26, 2008.  Next, it says: "We have received information from your employer that you were released to return to work and that you did in fact return to work on October 27, 2008.  Therefore, as stated above you are no longer eligible for this benefit.  Accordingly, your LTD benefits are terminated effective October 27, 2008." (A.R. at 369.)  It continues:

> We had our peer physician review the medical records received and also had a peer review telephone consultation with Dr. Pulido on November 21, 2008. Based on our review, the medicals do not support a disability from your own occupation as a Senior Customer Solutions Associate after October 29, 2008. . . . Accordingly, we are denying your claim for LTD benefits effective October 29, 2008.

(*Id.*)

Ms. Lovejoy appealed Aetna's decision on December 11, 2008.  She argued that the functional capacity evaluation did not show whether she could perform her duties because it did not indicate whether she was able to type or do her assigned tasks for eight hours. (A.R. at 374.)  Ms. Lovejoy also asserted that her doctors did not recognize the severity of her fall on May 3, 2008, and that they should have performed follow-up tests.  In support of her appeal, Ms. Lovejoy submitted additional information: (1) the CPAP titration study and diagnosis of sleep apnea; (2) notes from a June 15, 2007 myocardial perfusion scan; (3) progress notes from Dr. Sta

Ana since 2006; (4) the Emergency Department Evaluation from the May 4, 2008 visit; (5) a letter regarding her visit with Dr. Craig M. Morgan, stating that she had optic neuropathy; (6) a consultation report from Dr. Avrom D. Epstein, a neuro-ophthamologist; and (7) records from Thrush and Clark Allergists.

Ms. Lovejoy also submitted records from a January 2009 medical evaluation performed by Dr. Prasadarao B. Mukkamala in connection with her workers' compensation claim.[2] He stated that Ms. Lovejoy complained of pain in both hands, but she said it was worse on the right hand. Dr. Mukkamala explained that: "The color, surface, temperature and texture of the skin were normal and symmetrical. The claimant demonstrated good fine motor dexterity in both hands as seen by her ability to pick up small objects such as a tiny paperclip and a penny from my examination table." (A.R. at 419.) In his conclusion, he wrote: "With relation to return to work, the claimant does not feel that she can return to work at this time. However, there were no objective physical findings to support her perceived inability to return to work. In other words, the claimant should be able to return to work. Her subjective symptoms far outweigh the objective findings." (*Id.*) He recommended that her workers' compensation claim be closed because Ms. Lovejoy reached her maximum degree of medical improvement. (*Id.*)

Dr. Winn, a specialist in ophthalmology, reviewed Ms. Lovejoy's appeal. He explained that her opthamology examination was normal except: "1) Double vision and extremes of gaze to the left and right. 2) A slight field loss in the upper field of vision of the right eye possibly due to a slight lid droop. 3) A slight insufficiency of fusion at near targets which apparently is asymptomatic at the present time." (A.R. at 523.) Dr. Winn concluded that: "There is nothing in her ocular examination which would prevent her from doing the work as listed in the

---

[2] Lovejoy's workers' compensation claim dates back to December 12, 2003, for carpal tunnel syndrome. This claim was administered by Avizent.

examination of her work requirements." (*Id.*)  Dr. Wachsman, a specialist in anesthesiology and pain management, also performed a peer review.  Dr. Wachsman attempted to reach Dr. Pulido on March 10 and 11, 2009.  With no success, he filed his report on March 14, 2009.  After a detailed review of Ms. Lovejoy's medical records, Dr. Wachsman reported:

> Given what is noted in the notes, there is [a] lack of objective findings to support that this patient needs to be classified as totally disabled.  She does meet the criteria based on FCE of sedentary with some accommodations such as breaks and icing of her hands.  It was noted by Dr. Mukkamala that he found no objective findings to require the patient not to work.

(A.R. at 540.)    He explained that no restrictions were necessary except breaks to allow Ms. Lovejoy to ice her hands.

On March 23, 2009, Aetna wrote a letter to Dr. Pulido, notifying him that its independent reviewer attempted to reach him to discuss Ms. Lovejoy's disability benefits.  The letter stated that if Dr. Pulido disagreed with the reviewer's analysis, he could call or write Aetna, explaining the grounds for his disagreement.  Aetna upheld its denial in a letter to Ms. Lovejoy on May 11, 2009.  The letter listed the documentation that it considered in its review.  It specified that Dr. Pulido failed to reach Aetna after its attempt to coordinate a peer review.  It then says, "There is a lack of medical evidence to support your inability to perform the material duties of your occupation.  Therefore, based upon our review of the submitted documentation, and the rationale included herein, the original decision to terminate your benefits, effective 10/29/08, has been upheld."  (A.R. at 577.)

Ms. Lovejoy appealed on July 21, 2009.  She included in this appeal a June 3, 2009 letter from Dr. Pulido.  He opined that Ms. Lovejoy, "is currently not able to work, and her disability benefits should not be denied her."  (A.R. at 589.)  Dr. Pulido said that, "Mrs. Lovejoy has complaints of pain in both hands and arms which is exacerbated by her employment."  (*Id.*)  Ms.

Lovejoy also included a diagnostic report by Dr. Joby Joseph.  Dr. Joseph made the following conclusions:

> 1) Normal limits sensory and motor distal latencies of the median and ulnar nerves bilaterally. 2) The amplitude of the sensory action potentials of the median and ulnar nerves were decreased.  3) The sensory NCV of the median and ulnar nerves were slow.  4) EMG did not show any fibrillation or other evidence of denervation.

(A.R. at 595.)  He also made three impressions: "1) No electrodiagnostic evidence of Carpal tunnel syndrome. 2) There is evidence of sensory neuropathy of the median and ulnar nerves bilaterally.  3) An upper extremity radiculopathy was not demonstrated."  (*Id.*)  On July 28, 2009, Aetna sent a letter to Ms. Lovejoy that is nearly identical to its May 11, 2009 letter, upholding its denial.

Ms. Lovejoy appealed on August 12, 2009.  Dr. Mazal, a specialist in internal medicine, reviewed Ms. Lovejoy's claim for Aetna.  Dr. Mazal stated that there was:

> no support for a loss of functionality that would preclude the claimant from performing her job duties during the time period under consideration, 10/29/08 through the present date.  Although the claimant has apparently been diagnosed with diabetes mellitus, there has been no documentation of any degree of uncontrolled diabetes that would preclude the claimant from performing her job duties during the time period in question.

(A.R. at 696.)  He also noted that although Ms. Lovejoy has a history of sleep apnea, "there is no documentation of any clinically significant cognitive impairment on the basis of sleep apnea syndrome, nor is there any documentation of pathological daytime hypersomnolence."  (*Id.*)  He concludes that, "no restrictions or limitations would be needed at the workplace on the basis of the claimant's internal medicine problems."  (A.R. at 697.)

Dr. Schmeyer, a specialist in opthamology, also examined Ms. Lovejoy's medical records for Aetna.  He stated: "I do not identify any ocular, ophthalmic, or visual functional impairment from 10/29/08 to the present.  The exam findings do not corroborate visual system impairment."

(A.R. at 704.)   Finally, Dr. Rischitelli, a specialist in occupational medicine, thoroughly reviewed Ms. Lovejoy's medical records.   Dr. Rischitelli consulted with Ms. Lovejoy's primary care physician, Dr. Sta Ana.   Dr. Rischitelli wrote: "I explained the sedentary classification of her job, and the lack of objective findings.   [Dr. Sta Ana] stated that she feels unable to return to work and that anxiety and depression complicates her presentation."   (A.R. at 731.)   Dr. Rischitelli then explained:

> Ms. Lovejoy complains of bilateral hand and upper extremity symptoms.   These are not supported by objective findings.   Her absence from work has been primarily driven by her perceived inability to tolerate her job tasks and her subjective complaints of pain during a trial of graduated return to work.   Recent electrodiagnostic studies revealed no evidence of median or ulnar neuropathy from a compressive lesion.   The findings of a sensory neuropathy of the bilateral median and ulnar nerves are consistent with her diagnosis of diabetes.   These changes are mild, and do not suggest significant impairment.   The examination by Dr. Mukkamala revealed no objective findings of impairment that would support her continued work absence.

(*Id.*)   He then stated that because "of the absence of objective clinical findings of impairment, no work restrictions are advised."   (*Id.*)

On September 18, 2009, Aetna advised Ms. Lovejoy of its decision to uphold its denial of LTD benefits.   Aetna's letter to Ms. Lovejoy stated that: "Based upon our review of the submitted documentation, and the rationale detailed herein, the Aetna Appeal Committee has determined that there was a lack of medical evidence to support your inability to perform the material duties of your own occupation, effective 10/29/08."   (A.R. at 738.)   It also explained that if she disagreed with Aetna's decision, Ms. Lovejoy could file a civil action under § 502(a) of ERISA.

## II.    Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   FED. R.

CIV. P. 56(a).  In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor."  *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion.  *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds*, 490 U.S. 228 (1989).

## III.    Analysis

The court notes initially that it is the plaintiff's burden to demonstrate her entitlement to benefits under the Plan.  *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005) (cited in *Donnell v. Metro. Life Ins. Co.*, No. 04-2340, slip op. at *4 n.9, 2006 WL 297314 (4th Cir. Feb. 8, 2006)).  The standard of review for a decision made by an administrator of an ERISA benefit plan generally is *de novo*.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989).  Where the plan gives the administrator discretion to determine benefit eligibility or to construe plan terms, however, the standard of review is whether the administrator abused its discretion.  *Id.*; *Stup v. Unum Life Ins. Co. of Am.*, 390 F.3d 301, 307 (4th Cir.2004). Under this standard, a plan administrator's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently.  *Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004); *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000). "[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997) (internal quotation marks omitted).

Where a plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, however, a reviewing court must also weigh that conflict "in determining whether there [has been] an abuse of discretion."  *Firestone*, 489 U.S. at 115; *see Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000).  For example, if an administrator serves in the dual role of evaluating and paying benefit claims, it has a structural conflict of interest.  *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 632 (4th Cir. 2010).  Beyond these considerations for setting the applicable standard of review, the court of appeals in *Booth* provided guidance on how to conduct an inquiry concerning the reasonableness of an administrator's decision.   The court of appeals assembled a multi-factor test, which includes:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d at 342-43.

There are compelling reasons for the deferential standard of review, not the least of which is that it "'ensure[s] that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional.'" *Brogan v. Holland*, 105 F.3d 158, 164 (4th Cir. 1997). Additionally, the court is cognizant of the principle that plan fiduciaries are "obligated 'to guard the assets of the trust from improper claims, as well as . . . to pay legitimate claims.'" *See id.* (quoting *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 207 (4th Cir. 1984)).

In this case, it is undisputed that the Plan provided Aetna with the discretion to determine benefit eligibility; therefore, the standard of review is whether Aetna abused its discretion. Ms. Lovejoy first argues that Aetna is a conflicted claims administrator. Consequently, Ms. Lovejoy contends that the court must consider Aetna's conflict in determining whether it abused its discretion. *Firestone*, 489 U.S. at 115. The plaintiff notes that AEP has changed administrators on several occasions between 1999 and 2011. The plaintiff suggests that AEP is engaged in a "race to the bottom" by shopping for a claims administrator who will deny valid claims to reduce costs for AEP. Accordingly, the plaintiff argues that Aetna should be considered a conflicted administrator because it was operating under the threat that AEP would terminate Aetna's services if it did not cut costs for AEP by denying valid claims.

A similar argument was rejected by Judge Chambers in *Conley v. Cingular Wireless Employee Health & Benefits Plan*, No. 3:09-cv-0327, 2010 WL 3491223, at *6 (S.D. W. Va. Sept. 1, 2010). Judge Chambers reasoned: "Given the fact the Plan is self-funded and there is a third party making disability determinations, the Court finds Plaintiff has failed to demonstrate that the Court should emphasize the conflict of interest factor. A significant conflict of interest is

not established merely because Broadspire is paid for its services." *Id.* (internal citation omitted). Similarly, I do not accept the plaintiff's argument that Aetna was conflicted because AEP could terminate its services if it was not satisfied with Aetna's performance. "As this must be the situation for nearly every independent claims administrator, the Court cannot conclude that Aetna's role creates a significant degree of conflict." *Roberts v. Am. Elec. Power Long-Term Disability Plan*, 3:07-cv-0593, 2010 WL 2854299, at *8 (S.D. W. Va. July 19, 2010).

Next, the plaintiff argues that Aetna's denial conflicts with the Social Security Administration's ("SSA") determination that the plaintiff has been disabled since April 28, 2008. The SSA provided Ms. Lovejoy with its Notice of Decision in July 2010. Aetna upheld its denial of benefits for the final time on September 18, 2009. "When reviewing an administrator's decision, courts may not consider extrinsic evidence, that is, any evidence not brought before the administrator, initially or in subsequent administrative reviews." *Hines v. Unum Life Ins. Co. of Am.*, 110 F. Supp. 2d 458, 464 (W.D. Va. 2000) (citing *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608-09 (4th Cir. 1999)). Consequently, the SSA's decision is not relevant to the determination of whether Aetna's decision was an abuse of discretion because it was not brought before the administrator prior to filing this suit.

Alternatively, the plaintiff requests that the court remand her claim to Aetna for a new determination because she claims that Aetna did not have significant medical records for the relevant time period. In particular, Ms. Lovejoy states that Aetna did not have a copy of the SSA decision or records from Ms. Lovejoy's visit to Kanawha Valley Physical Therapy. Neither the SSA decision nor the physical therapy records existed until after Aetna issued its final decision upholding its denial of LTD benefits. "Remand should be used sparingly." *Elliott*, 190 F.3d at 609 (quoting *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir. 1985)). It is appropriate

when "the plan itself commits the trustees to consider relevant information which they failed to consider or where the decision involves records that were readily available and records that trustees had agreed that they would verify." *Id.* (internal quotation marks omitted).   A district court may also remand a claim when "there are multiple issues and little evidentiary record to review."   *Id.*    None of these scenarios are presented in this case.   The SSA decision and physical therapy records were not readily available.   And while they do shed light on Ms. Lovejoy's medical issues, there was a substantial amount of evidence before Aetna when it made its determination.

The plaintiff concludes her argument by stating that: "based on her medical records, the opinions of her treating physicians, and the Notice of Award from the Social Security Administration . . . she is, for all purposes under the Plan, disabled and entitled to benefits." (Mem. Supp. Pl.'s Mot. Summ. J. [Docket 17], at 18.)  Specifically, Dr. Pulido asserted that Ms. Lovejoy was not able to work and "disability benefits should not be denied her."  (A.R. at 589.) The court, however, is not required to give special weight to Dr. Pulido's opinion.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Moreover, the court cannot create a discrete burden of explanation on the plan administrator when it "credit[s] reliable evidence that conflicts with a treating physician's evaluation."  *Id.*  Dr. Pulido's opinion was conclusory, stating only that: "Mrs. Lovejoy has complaints of pain in both hands and arms which is exacerbated by her employment."  (A.R. at 589.)

In the instant dispute, the plaintiff has failed to meet its burden of showing that Aetna abused its discretion in denying Ms. Lovejoy LTD benefits under the Plan because its decision was unreasonable.  To the contrary, Aetna's decision was the result of a deliberate, principled reasoning process and was supported by substantial evidence.  *Ellis v. Metro. Life Ins. Co.*, 126

16

F.3d 228, 232 (4th Cir. 1997). First, with respect to the process, Ms. Lovejoy's LTD benefits claim was reviewed by six doctors. There were different doctors at each level of appeal—Dr. Spira initially, Dr. Winn and Dr. Wachsman for the first appeal, and Dr. Mazal, Dr. Schmeyer, and Dr. Rischitelli for the final appeal. Their specialties were relevant to Ms. Lovejoy's complaints, including psychiatry and neurology, ophthalmology, anesthesiology and pain management, internal medicine, and occupational medicine. Furthermore, Aetna notified Ms. Lovejoy each time the denial of her LTD benefits was upheld; it also explained to her the appeals process and allowed her to provide Aetna with any additional medical documentation. After the final denial, Aetna explained that she had the right at that point to bring a civil action under §502(a) of ERISA.

In addition, Aetna had substantial evidence to support its decision. Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)), *overruled by implication on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003). Each reviewing physician was given Ms. Lovejoy's medical records from Dr. Pulido, the October 2, 2008 functional capacity evaluation, Ms. Lovejoy's LTD application, and a job analysis. Dr. Spira also consulted with Dr. Pulido. Dr. Wachsman was unsuccessful in his attempt to contact Dr. Pulido. Dr. Spira, Dr. Mukkamala, Dr. Wachsman, and Dr. Rischitelli all noted Ms. Lovejoy's subjective complaints of pain in their evaluations. However, they found that there was a lack of objective findings that were consistent with her complaints. Accordingly, her subjective complaints of pain were not sufficient to qualify her for LTD benefits. In light of the opinions of the six reviewing physicians and the conclusory nature of Dr. Pulido's opinion, Aetna did not abuse its discretion

in coming to a conclusion contrary to Dr. Pulido's opinion.  In sum, although there is evidence in the record that the plaintiff dealt with several medical issues, Ms. Lovejoy has not proven that Aetna's determination that her medical issues did not prevent her from performing her duties as a customer solutions associate was unreasonable.

For the above-stated reasons, the court **GRANTS** the defendant's Motion for Summary Judgment and **DENIES** the plaintiff's Motion for Summary Judgment.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: February 3, 2012

Joseph R. Goodwin, Chief Judge